UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GOURMET KITCHENS, INC., | ) | Case No. 11-19605 |
| | ) | |
| Debtor. | ) | Hon. Jacqueline P. Cox |

FINAL ORDER (I) AUTHORIZING POSTPETITION FINANCING, (II) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS, AND (III) GRANTING RELATED RELIEF

Upon final consideration of the motion (the "Motion") of Gourmet Kitchens, Inc. (the "Debtor") for the entry of an order pursuant to 11 U.S.C. §§ 105, and 364 and Fed. R. Bankr. P. 4001 authorizing it to (i) obtain up to $300,000 in postpetition financing from MB Financial Bank, N.A. ("MB") subject to the terms and conditions set forth herein, (ii) grant security interests and other liens and superpriority claims (including claims, liens and security interests pursuant to 11 U.S.C. § 364(c), (d)) to MB to secure the postpetition financing, and (iii) grant related relief in connection with the foregoing, all as more fully set forth herein; this Court having conducted a preliminary hearing on the Motion on December 6, 2011 and having entered an order on December 6, 2011 that granted the Motion on an interim basis and scheduled the Motion for a final hearing ("Final Hearing") to consider the entry of a final order on the Motion; upon the proceedings held before this Court; and good and sufficient cause appearing therefor,

THE COURT HEREBY FINDS AS FOLLOWS:

A.  On May 8, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is now operating its business and managing its properties as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

B. Notice of the Motion and the Final Hearing by the Debtor satisfied the requirements of Rule 4001 (c) and (d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

D. On or about December 1, 2011, this Court entered an order authorizing the sale of substantially all of the Debtor's assets free and clear of liens, claims and other interests (the "Sale").

E. In anticipation of the closing of the Sale, MB is willing to provide up to $300,000 in postpetition financing (the "DIP Financing") to the Debtor, subject to the terms and conditions set forth herein.

F. Good cause has been shown for the entry of this Order. The Debtor requires the contemplated postpetition financing. The DIP Financing will enable the Debtor to pay trailing administrative liabilities following the closing of the Sale, including accrued payroll to employees, and to continue to pay estate professionals and advisors to administer the Debtor's estate for the benefit of creditors. Without such DIP Financing, the Debtor's employees and its professionals will discontinue performing services for the Debtor's estate. As a result, the Debtor will be unable to administer, and maintain the value of, its remaining assets, causing irreparable harm to the Debtor, its estate and its creditors.

G. Except as provided in this Order, the Debtor is unable to obtain the required financing in the form of (a) unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code, (b) an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, (c) unsecured debt solely having the priority afforded by section

364(c)(1) of the Bankruptcy Code, or (d) debt secured as described in section 364(c)(2) or (3) of the Bankruptcy Code.

H.  The terms of the DIP Financing have been negotiated in good faith and at arm's length among the Debtor and MB, and such terms are fair and reasonable under the circumstances, reflect the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties and are supported by reasonably equivalent value and fair consideration.

I.  This Court concludes that the entry of this Order is in the best interests of the Debtor, its estate and creditors as its implementation will, among other things, allow for the orderly administration of the Debtor's estate and preservation and maximization of the value of the assets remaining in such estate.

THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED THAT:

1.  All objections to the entry of this Order have been withdrawn or overruled and the Motion is granted on a final basis, subject to the terms and conditions set forth in this Order.

2.  The Debtor is authorized to incur the DIP Financing and thereby borrow from MB, pursuant to the terms of this Order, up to an aggregate principal amount of $300,000 to pay the expenses set forth in the budget attached to this Order as Exhibit A (the "Budget").

3.  Notwithstanding anything to the contrary in this Order, the Debtor shall not be permitted to use DIP Financing loans to pay any professional fees unless the other expenses contemplated in the Budget are paid in full or MB provides its written consent to such professional fee payments.

4. Subject to the terms of this Order, the Debtor is hereby authorized to take such further actions and enter into such agreements, instruments and documents (collectively, the "DIP Loan Documents")[1] as may reasonably be necessary or required to evidence the DIP Financing and its corresponding obligations to MB, and to consummate the terms and provisions of this Order. Upon execution and delivery of the DIP Loan Documents, they shall constitute the valid and binding obligation of the Debtor enforceable against the Debtor according to their terms.

5. All borrowings and other indebtedness and obligations incurred by the Debtor pursuant to this Order and the DIP Loan Documents (including principal, accrued and unpaid interest) are referred to herein as the "DIP Indebtedness."

6. The DIP Indebtedness shall bear interest at the rate of six percent (6%) per annum. MB will also be entitled to assess and collect a commitment fee on the DIP Financing in the amount of $10,000, which commitment fee will be added to the DIP Indebtedness.

7. To secure the DIP Indebtedness, MB is hereby granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, valid, binding, enforceable and perfected liens on and security interests in (the "DIP Liens"), without limitation, any and all assets and rights of the Debtor, wherever located, whether now owned or hereafter acquired or arising, including all personal, fixture and real property, all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts, chattel paper (whether tangible or electronic), deposit accounts, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment

---

[1] Subject to the terms of this Order, the DIP Loan Documents will be similar to the

property, supporting obligations, other contract rights or rights to the payment of money, insurance claims and proceeds, all general intangibles, any and all causes of action (excluding any causes of action of the Debtor pursuant to Chapter 5 of the Bankruptcy Code), and the proceeds, products, rents and profits of all the foregoing (all of the foregoing, the "Collateral").

8. The DIP Liens shall constitute a first-priority perfected security interest in and lien upon all of the Collateral, except that with respect to the "Reiser Collateral" defined and described in Robert Reiser & Co., Inc.'s ("Reiser") Objection To Sale Motion (dkt. no. 232), the DIP Liens shall be subject to any valid, enforceable, and perfected purchase money security interests and liens held by Reiser. Specifically, pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior to and shall prime any preexisting liens or security interests that exist on the Collateral as of the date of this Order, except that with respect to the Reiser Collateral, the DIP Liens shall be subject to any valid, enforceable, and perfected purchase money security interests and liens held by Reiser.

9. The DIP Indebtedness shall also have administrative priority in this chapter 11 case in accordance with the provisions of section 364(c)(1) of the Bankruptcy Code over all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code ("Superpriority").

10. The DIP Indebtedness shall be immediately due on December 31, 2011 ("Loan Maturity Date"). Upon the Loan Maturity Date, the Debtor is authorized and directed to (x) pay the outstanding amount of the DIP Indebtedness to MB; and (y) use any cash proceeds of the Collateral other than the Reiser Collateral, including net proceeds generated from the

---

Debtor's prepetition revolving loan agreements with MB.

Sale and maintained at an account established at MB Financial Bank, named "Adelman & Gettleman Ltd, Agent for Gourmet Kitchens, Inc." in order to make such payment.

11. Until the DIP Indebtedness is paid in full, the Debtor is enjoined and prohibited from (i) granting claims or liens in the Collateral or any portion thereof to any other parties pursuant to sections 364(c) and (d), 503(b) or 507(b) of the Bankruptcy Code or otherwise, which claims or liens are senior to, or on parity with, any of the DIP Liens or the Superpriority claims or (ii) disbursing net Sale proceeds generated from the Collateral, except for net Sale proceeds generated from the Reiser Collateral.

12. The liens granted herein shall be deemed valid, binding, enforceable and perfected upon entry of this Order. MB shall not be required to file any UCC-1 financing statements, mortgages, deeds of trust, security deeds, notices of lien or similar documents or take any other action (including possession of any of the Collateral) in order to validate the perfection of the liens granted herein. If MB, in its discretion, chooses to file any such mortgages, deeds of trust, security deeds or UCC-1 financing statements, or take any other action to validate the perfection of any part of the liens granted hereunder, the Debtor and its officer(s) are directed to execute any documents or instruments as MB may reasonable request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Order. MB may, in its discretion, file a certificated copy of this Order in any filing office in any jurisdiction in which the Debtor is organized, or has or maintains Collateral or an office, and each filing office is directed to accept such certified copy of this Order for filing and recording. The Debtor shall execute and deliver to MB all such agreements, financing statements, instruments and other documents as MB may reasonably request to evidence, confirm, validate or perfect the liens granted pursuant hereto.

13. Subject to the following paragraph, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby vacated as to MB to permit it to perform in accordance with, and exercise, enjoy and enforce its rights, benefits, privileges and remedies pursuant to this Order and any other DIP Loan Documents without further application or motion to, or order from, the Court, and regardless of any change in circumstances (whether or not foreseeable), neither § 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be utilized to prohibit MB's exercise, enjoyment and enforcement of any of such rights, benefits, privileges and remedies. MB is hereby granted leave, among other things, to (a) receive and apply payments and proceeds of the Collateral to the DIP Indebtedness, (b) to give the Debtor any notice provided for in any of the DIP Loan Documents or this Order, and (c) upon the occurrence of a default under such documents, or upon the Loan Maturity Date, and without application or motion to, or order from the Court or any other court, (i) terminate the DIP Financing under this Order and the other DIP Loan Documents, (ii) declare all DIP Indebtedness immediately due and payable, (iii) revoke the Debtor's right, if any, under this Order and/or the other DIP Loan Documents and (iv) cease making loans or other extensions of credit and/or suspend or terminate any obligation of MB to make loans or other extensions of credit under this Order or the DIP Loan Documents.

14. Upon the occurrence of the Loan Maturity Date or any default of the Debtor under the DIP Loan Documents or this Order, MB shall be entitled (i) to file an emergency motion for relief from the automatic stay for the purpose of foreclosing or otherwise enforcing its liens on any or all of the Collateral and/or to exercise any other default-related remedies under the DIP Loan Documents, this Order or applicable law, and (ii) to obtain an expedited hearing on such motion upon three (3) days' notice to counsel for the Debtor, counsel

for the official committee of unsecured creditors (the "Committee") and the U.S. Trustee. MB shall be entitled to such relief from the automatic stay upon a showing only that one or more defaults have occurred and are then continuing or that the Loan Maturity Date has occurred. Upon the entry of an order granting MB relief from the automatic stay to enforce its liens or to exercise any other default-related remedies, (i) MB may exercise any remedies available to MB under this Order and the DIP Loan Documents or applicable law, including to foreclose on the Collateral, (ii) provided that MB in its sole discretion has made available to the Debtor (through additional Postpetition Loans or by consenting to Debtor's use of cash collateral) sufficient funds to pay the costs thereof, the Debtor shall cooperate with MB in connection with any enforcement action by MB by, among other things, (A) providing access to its premises to representatives of MB, (B) providing MB access to its books and records, (C) performing all other obligations set forth in this Order and/or the other DIP Loan Documents, and (D) taking reasonable steps to safeguard and protect the Collateral until MB can make adequate provision to protect and safeguard the Collateral, and the Debtor shall not otherwise interfere or encourage others to interfere with MB's enforcement of its rights. Nothing contained herein shall prohibit the Debtor from contesting the occurrence of a default or the request by MB to modify the automatic stay.

15. Notwithstanding anything herein or the occurrence of a Default under the DIP Loan Documents, all of the rights remedies, benefits and protections provided to MB under the DIP Loan Documents and this Order shall survive the Default and any termination of the DIP Loan Documents or the obligations of MB thereunder.

16. The provisions of this Order shall be binding upon and inure to the benefit of MB and the Debtor and their respective successors and assigns (including any trustee hereafter appointed or elected for the Debtor's estate, an examiner appointed pursuant to section 1104 of

the Bankruptcy Code, or any other fiduciary hereafter appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor).

17. Based on the findings set forth in this Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the financing arrangement contemplated by this Order, in the event that any or all of the provisions of this Order or the DIP Loan Documents are hereafter modified, amended or vacated by a subsequent order of this Court, no such modification, amendment or vacation shall affect the validity, enforceability or priority of any liens or claims authorized or created hereby or thereby.

18. To the extent of any conflict between or among the express terms or provisions of the Loan Documents, the Motion, any other order of this Court, or any other agreements and the express written terms and provisions of this Order, the terms and provisions of this Order shall govern.

19. This Order shall take effect immediately upon execution hereof.

20. This Court retains and reserves jurisdiction to enforce all provisions of this Order.

Dated: December 20, 2011

**ENTER:**

*/s/ Jacqueline P. Cox*

Jacqueline P. Cox
United States Bankruptcy Judge

**AGREED TO:**

| **GOURMET KITCHENS, INC.** | **MB FINANCIAL BANK, N.A.** |
|---|---|
| By: _____<br>One of its attorneys | By: _____<br>One of its attorneys |
| Chad H. Gettleman<br>Nathan Q. Rugg<br>Adelman & Gettleman, Ltd.<br>53 W. Jackson Blvd., Suite 1050<br>Chicago, IL 60604 | Robert W. Glantz<br>Peter J. Roberts<br>Shaw Gussis Fishman Glantz<br>  Wolfson & Towbin LLC<br>321 North Clark Street, Suite 800<br>Chicago, IL 60654 |

# EXHIBIT A

Case 11-19605    Doc 249    Filed 12/20/11    Entered 12/21/11 13:02:22    Desc Main
Case 11-19605    Doc 241    Filed 12/06/11    Entered 12/07/11 09:56:58    Desc Main
Case 11-19605    Doc 238    Filed 12/02/11    Entered 12/02/11 16:08:47    Desc Main
            Document      Page 12 of 12
            Document      Page 13 of 13
            Document      Page 24 of 24

## Gourmet Kitchens, Inc. Cash Flow Forecast

Cash Flow Forecast

| Week Ending: | 12/03/11 | 12/10/11 or thereafter | Total |
|---|---|---|---|
| Revenues | 305,074 | 215,574 | 520,648 |
| **Cash Receipts** | | | |
| Collections | 320,573 | 223,271 | 543,844 |
| **Total Cash Receipts** | 320,573 | 223,271 | 543,844 |
| **Operating Disbursements** | | | |
| Ingredients/Packaging | 128,860 | 113,189 | 242,049 |
| Freight | 10,150 | 6,275 | 16,425 |
| Payroll | 99,000 | 99,000 | 198,000 |
| Employee Insurance & 401-k Withheld | 19,327 | 1,100 | 20,427 |
| Rent | 29,246 | — | 29,246 |
| Utilities | 29,499 | 3,300 | 32,799 |
| Insurance | 44,600 | — | 44,600 |
| Maintenance | 3,200 | 3,200 | 6,400 |
| Other | 14,500 | 4,150 | 18,650 |
| Supplies | 2,500 | 2,500 | 5,000 |
| Traveling/Marketing | 2,000 | 2,000 | 4,000 |
| Rebates/Brokers | — | — | — |
| Chemicals/Cleaning | 2,000 | 2,000 | 4,000 |
| Lease Payments (Equipment) | 2,800 | 3,000 | 5,800 |
| Truck Lease | 3,000 | 3,000 | 6,000 |
| Operating Disbursements | 390,682 | 242,714 | 633,396 |
| Net Cash Flow before Professionals | (70,110) | (19,443) | (89,552) |
| **Professional Fees** | | | |
| USTO | — | — | — |
| Attorneys | — | 19,767 | 19,767 |
| Financial Advisors | — | 125,000 | 125,000 |
| Professional Services | — | 144,767 | 144,767 |
| Total Cash Disbursements | 390,682 | 387,481 | 778,163 |
| Net Cash Flow | (70,110) | (164,210) | (234,319) |
| Change in Float | 37,090 | (105,000) | (67,910) |
| Net Change in Cash | (33,020) | (269,210) | (302,229) |

12/2/2011

GKI - Cash Flow forecast - Nov 26-Dec 10 2011 v1